**The document below is hereby signed.**

**Dated: October 4, 2011.**



_____
**S. Martin Teel, Jr.**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| GB HERNDON AND ASSOCIATES, | ) | Case No. 10-00945 |
| INC., | ) | (Chapter 11) |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| ADAMS NATIONAL BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Proc. No. 10-10052 |
| v. | ) | |
| | ) | |
| GB HERNDON AND ASSOCIATES, | ) | |
| INC., _et al._, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM DECISION RE DEFENDANTS' MOTION FOR
<u>RELIEF FROM JUDGMENT AND TO ALTER OR AMEND JUDGMENT</u>

The defendants have filed with the court a Motion for Relief

from Judgment and to Alter or Amend Judgment (Dkt. No. 61, filed

July 7, 2011).  For the reasons that follow, I will deny the

motion.

I

The facts underlying the defendants' motion are as follows.

In March 2006, the debtor borrowed $7,797,729 from Adams National

Bank[1] for purposes of constructing a complex of ten single-family homes and sixteen condominium units at 915 12th Street, NE, Washington D.C.  Amd. Ans. at 3.  Twelfth Street Partners, LLC, and Gloria B. Herndon, co-defendants in this adversary proceeding, agreed to serve as guarantors on the loan.  Amd. Ans. at 3.  The parties also entered into a Building Loan Agreement, which set forth the terms under which Adams Bank was obligated to advance funds for the project.  Amd. Ans. Ex. 1.

Subsequent to their execution of the note and Building Loan Agreement, the parties entered into a series of five Modification, Extension and Reaffirmation Agreements, the last of which was executed on April 30, 2009.  Amd. Ans at 5.  On December 22, 2009, the parties entered into a forebearance agreement.  Amd. Ans. at 9.  At that point, Adams Bank had released $7,153,943.27 of the original commitment.  Amd. Ans. at 6.

In the December 2009 forbearance agreement, the defendants acknowledged that the debtor owed the amount advanced, plus interest in the amount of $79,454.65, unpaid late charges, collection expenses, and additional interest from December 7, 2009. Forbearance Agrmt. at R-3.  Further, the debtor, Herndon, and Twelfth Street also confirmed that there were no "claims,

---

[1]     Premiere Bank, Inc., is now the successor in interest to Adams National Bank by merger.  For ease of reference, I will refer to the plaintiff as Adams Bank.

2

offsets, or counterclaims in favor of any of the Debtors that
would reduce [the amount due]."  Forbearance Agrmt. ¶ 2.1.  Adams
Bank agreed to forbear until March 30, 2010, upon the following
conditions:

(a)   the debtor pay all outstanding interest due and pay
      accruing interest on a forward-going basis;
(b)   the debtor engage a general contractor "acceptable to
      Lender in its sole and absolute discretion";
(c)   the debtor pay in full the manufacturer of the modular
      units and arrange for their removal from the
      manufacturer's storage;
(d)   the debtor provide proof of payment of real estate
      taxes; and
(e)   the debtor provide copies of three executed contracts
      for the purchase of units.

Forbearance Agrmt. ¶ 2.4.  The forbearance agreement additionally
provided that Adams Bank was not obligated to advance any further
funds, Forbearance Agrmt. ¶ 2.3, and the debtor was to advance
any other costs related to the completion of the units,
Forbearance Agrmt. ¶ 9.3.  Finally, the defendants waived any
pre-existing claims they had against Adams Bank, Forbearance
Agrmt. at ¶¶ 11.1 & 29, and any automatic stay protection in
bankruptcy, Forbearance Agrmt. ¶ 11.2

On May 13, 2010, Adams Bank commenced an action in the
District of Columbia Superior Court against the debtor, Twelfth
Street Partners, LLC, and Gloria B. Herndon, alleging that the
defendants were in breach of the forbearance agreement.  Compl. ¶
12.  Adams Bank sought judgment against all the defendants in the
amount of $8,828,858.34, consisting of $7,677,268.12 due and

owing as of May 11, 2010, $1,151,590.22 in attorney's fees, and

per diem interest of $1,192.32.   The defendants thereafter filed

an answer to the complaint and asserted counterclaims against

Adams Bank for breach of contract, tortious interference with

contract, and breach of duty of good faith and fair dealing.

Amd. Ans. at 7-10.   The counterclaims were based on Adams Bank's

alleged failure to advance funds to the debtor as required by the

terms of the Building Loan Agreement.

    While the Superior Court action was pending, Adams Bank

sought to foreclose on the collateral securing the note and

scheduled a foreclosure sale for 2:00 PM on September 24, 2010.

Def.'s Mot. for TRO at 1.   Prior to the foreclosure sale, the

defendants filed an emergency ex parte motion for temporary

restraining order to stop the foreclosure sale in the Superior

Court, contending that Adams Bank's failure to advance funds as

required by the terms of the Building Loan Agreement constituted

a material breach of the agreement and, thus, barred recovery by

Adams Bank under the note and barred foreclosure.   Def.'s Mot.

for TRO at 11-12.   The Superior Court denied the defendants'

motion at a hearing on the morning of the scheduled foreclosure

sale.   Sup. Ct. Dkt., Case No. 2010 CA 003361.

    At 1:53 on September 24, 2010, the debtor commenced a case

under chapter 11 of the Bankruptcy Code in this court, thereby

triggering the automatic stay, stopping the foreclosure sale, and

staying the proceeding in the Superior Court. Adams Bank thereafter moved for relief from the stay to continue with the foreclosure on the basis of the stay waiver in the December 2009 forbearance agreement, lack of adequate protection, and that there was no equity in the property and it was not necessary for an effective reorganization. Adams Bank also moved for relief from stay to continue the proceeding before the Superior Court. In an order entered on March 4, 2011, I granted Adams Bank's motion for relief as to the foreclosure. Prior to ruling on the latter lift stay motion, the debtor removed the Superior Court action to this court as the above-captioned adversary proceeding.

After removal, Adams Bank filed a motion for partial summary judgment on the defendants' removed counterclaims. Its arguments were twofold. First, Adams Bank argued that partial summary judgment was appropriate as to any counterclaims existing prior to the December 22, 2009, forbearance agreement because the defendants had expressly waived them in that agreement. Pl.'s Mot. Part. Sum. Jdgmt. at 8. With respect to claims that arose after the parties entered into the forbearance agreement, Adams Bank contended that judgment was warranted because Adams Bank had done nothing contrary to the terms of the agreement. The defendants filed in opposition to the motion, and after a hearing on the motion on January 28, 2011, I granted Adams Bank's motion

and dismissed the defendants' counterclaims.[2]

Adams Bank thereafter filed a motion for summary judgment as to its claim, asking the court to enter judgment against all the defendants, jointly and severally, in the amount of $8,402,454.70, plus per diem interest from February 16, 2011, of $2,185.93 and costs.  The defendants' objection to the motion challenged only the calculation of interest due and the reasonableness of the attorneys' fees Adams Bank sought.  Opp. Pl.'s Mot. Sum. Jgmt. at 3.

At a pretrial conference on May 17, 2011, I granted in part Adams Bank's motion for summary judgment on its loan claim.  With respect to the interest calculations, I granted summary judgment in favor of Adams Bank.  With respect to the attorneys' fees, I granted the defendants leave to review the billing records; the defendants subsequently stipulated to the amount (Dkt. No. 52). On June 23, 2011, the court entered judgment in favor Adams Bank against the debtor, Gloria B. Herndon, and Twelfth Street Partners, LLC, in the amount of $8,532,253.74.

The defendants have now filed a Motion for Relief from Judgment and to Alter or Amend Judgment, seeking relief in the

---

[2]    The day prior to the hearing on Adams Bank's motion for summary judgment the defendants filed a motion for leave to amend their answer and counterclaims.  I denied the motion to the extent the defendants sought to amend their counterclaims and granted it to allow them to amend certain affirmative defenses (Dkt. No. 33).  I discuss the amended counterclaims in Part III.B.

alternative under Rules 59 and 60.  In sum, the defendants
contend that this court lacked authority to deny the defendants'
counterclaims and, thus, the June 23, 2011, judgment in favor of
Adams Bank was not appropriate.  Adams Bank timely filed a
response, and the defendants filed a reply.


## II

Pursuant to Rule 59(e) of the Federal Rules of Civil
Procedure (incorporated in Bankruptcy by Fed. R. Bankr. P. 9023),
a court may alter or amend a previously entered judgment on
motion of a party.  The disposition of a Rule 59(e) motion is
within the court's discretion, and "need not be granted unless
the district court finds there is an intervening change of
controlling law, the availability of new evidence, or the need to
correct a clear error or prevent manifest injustice." *Ciralsky
v. Cent. Intelligence Agency*, 355 F.3d 661, 671 (D.C. Cir. 2004)
(internal quotations omitted).  The party moving for relief under
Rule 59(e) carries the burden of demonstrating relief is
warranted, *Owen-Williams v. BB&T Inv. Serv. Inc.,* 2011 WL
2783783, *4 (D.D.C. July 18, 2011), and the motions are
"disfavored and relief from judgment is granted only when the
moving party establishes extraordinary circumstances,"
*Niedermeier v. Office of Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C.
2001).

7

Under Rule 60(b), the court may relieve a party from a final judgment for six enumerated reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud, misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) satisfaction, discharge, or release of the judgment; or (6) any other reason that justifies relief. Under Rule 60(b)(1), a decision inconsistent with an intervening decisions of a higher court constitutes appropriate grounds for relief. *D.C. Federation of Civic Assoc. v. Volpe*, 520 F.2d 451, 453 (D.C. Cir. 1975).


III

In their Motion for Relief from Judgment and to Alter or Amend Judgment, the defendants contend that the court's grant of summary judgment in favor of Adams Bank was not appropriate because this court lacked constitutional authority to rule on their counterclaims:

> In the case *sub judice*, this Court's grant of summary judgment was premised off of the belief that all issues of material fact had been resolved. In light of the Supreme Court's decision in *Stern v. Marshall*, this Court did not have the constitutional authority to resolve the Defendants' Counterclaims, so such resolution has not been achieved. As with the counterclaims in *Stern*, the Defendants' Counterclaims are governed by state law, and may be resolved independently from the Adversary Proceeding. They do not "flow from a federal

8

statutory scheme," nor are they "'completely dependent upon' adjudication of a claim created by federal law." *Id.* at *20 (quoting *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 856 (1986)).  The Counterclaims may be adjudicated separately from the Bank's proof of claim, and three of them were, in fact, being adjudicated in the District of Columbia Superior Court prior to Bankruptcy removal.

Therefore, pursuant to the holding in *Stern*, this Court had no constitutional authority to resolve the Defendants' Counterclaims.  Because this Court's issuance of final judgment was premised off an erroneous belief that all Counterclaims were resolved, it is necessary in the interest of justice and out of deference for the doctrine of separation of powers, to lift final judgment, and to transfer the Counterclaims to a court with the constitutional authority to hear them.

Motion at 4-5.[3]

A

Because the defendants' motion for relief from the court's June 23, 2011, judgment is based solely on the Supreme Court's recent decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), I begin by summarizing the Court's decision.

Vicki Lynn Marshall filed a bankruptcy case in California

---

[3]  There is no issue of subject matter jurisdiction. Pursuant to the district court's referral of this proceeding by local rule to the bankruptcy court, the bankruptcy court was exercising the subject matter jurisdiction of the district court under 28 U.S.C. § 1334(b).  Under § 1334(b), the issues presented by the claims in this proceeding went to matters "arising in" the case (the allowance of Adams Bank's claim, and any claim by the debtor's co-defendants against the estate as guarantors) or were "related to" the case because the outcome of the claims would have an impact on the administration of this chapter 11 reorganization case.  The claims against the debtor's co-defendants would give rise to claims by them as guarantors against the estate, and would affect their ability to assist in funding a plan.

shortly after the death of her husband, J. Howard Marshall. *Stern,* 131 S. Ct. at 2601. In that bankruptcy case Pierce Marshall, J. Howard's son, filed a defamation complaint against Vicki in the bankruptcy court and sought a determination that the defamation claim was nondischargeable. *Id.* Vicki filed a counterclaim against Pierce for tortious interference with gifts she expected to receive from J. Howard through a living trust and his will. *Id.* The bankruptcy court granted Vicki summary judgment on Pierce's defamation claim. *Id.* The bankruptcy court then held a bench trial on Vicki's tortious interference claim, ultimately awarding her $400 million in compensatory damages and $25 million in punitive damages. *Id.*

Early in the litigation and in post-trial proceedings, Pierce contended that the bankruptcy court lacked authority to decide Vicki's counterclaim because it was not a core proceeding under 28 U.S.C. § 157(b). *Id.* The bankruptcy court disagreed with Pierce's argument and found it had the power to enter a final judgment. *Id.* The case wound through a long history of appeals and ultimately the Supreme Court granted certiorari to address two issues: (i) whether the counterclaim asserted by Vicki constituted a core proceeding under 28 U.S.C. § 157 and (ii) if it were core under the statute, whether a bankruptcy judge entering final judgment on the counterclaim violated Article III of the Constitution. *Id.* at 2602-03.

Answering the first issue in the affirmative, the Supreme
Court held that under 28 U.S.C. § 157(b)(2)(C) a counterclaim by
the estate against a person filing claims against the estate was
core. *Id.* 2605. Section 157(b)(2)(C) of Title 28 of the United
States Code includes as a core proceeding "counterclaims by the
estate against persons filing claims against the estate." The
Court rejected Pierce's argument that, notwithstanding the
language of § 157(b)(2)(C), the proceeding was non-core because
it did not arise under title 11 or arise in a case under title
11:

> Pierce argues that we should treat core matters that
> arise neither under Title 11 nor in a Title 11 case as
> proceedings "related to" a Title 11 case. Brief for
> Respondent 60 (internal quotations omitted). We think
> that a contradiction in terms. It does not make sense to
> describe a "core" bankruptcy proceeding as merely
> "related to" the bankruptcy case; oxymoron is not a
> typical feature of congressional drafting.

*Stern*, 131 S. Ct. at 2605. The court likewise rejected Pierce's
argument that the proceeding was non-core under § 157(b)(5)
because it was a personal injury claim, instead finding that §
157(b)(5) was not jurisdictional and that Pierce had consented to
the bankruptcy court adjudicating his defamation claim. *Id.* at
2606-07.

With respect to the second issue, the Court held that
although § 157 permitted the bankruptcy court to enter a final
judgment on the counterclaim, Article III of the Constitution did
not. *Id.* at 2606. First, the Court recognized that Article III

required cases at common law to be decided by judges who had both
life tenure and were not subject to a decrease in compensation.
*Id.* Importantly, however, the Court noted that an exception to
this requirement existed under the "public rights" doctrine.
Under this exception, non-Article III judges may decide "'matters
arising between' individuals and the Government 'in connection
with the performance of the constitutional functions of the
executive or legislative departments . . . that historically
could have been determined exclusively by those branches.'"  *Id.*
(quoting *Northern Pipe Line Constr. Co. v. Marathon Pipe Line
Co.*, 458 U.S. 50, 67-68 (1982)).  Vicki's tortious interference
claim, the Court found, did not fall within this narrow
exception:

> What is plain here is that this case involves the
> most prototypical exercise of judicial power: the entry
> of a final, binding judgment *by a court* with broad
> substantive jurisdiction, on a common law cause of
> action, when the action neither derives from nor depends
> upon any agency regulatory regime.  If such an exercise
> of judicial power may nonetheless be taken from the
> Article III judiciary simply by deeming it part of some
> amorphous public right, then Article III would be
> transformed from the guardian of individual liberty and
> separation of powers we have long recognized into mere
> wishful thinking.

*Id.* at 2614 (emphasis theirs).  Instead, the Court found that for
adjudicative authority to lie for a counterclaim outside of the
public rights exception it must either "stem[] from the
bankruptcy itself or [] necessarily be resolved in the claims

allowance process." *Id.* at 2618.[4]

Article III addresses both a structural, or separation or powers, interest, and also protects a personal interest: a litigant's "'right to have claims decided before judges who are free from potential domination by other branches of government,'" *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (quoting *United States v. Will*, 499 U.S. 200, 218 (1980)). Because the defendants' motion is ambiguous as to which of these bases they challenge this court's authority to decide their counterclaims, I will address both protected interests in turn.

B

There is no absolute individual right to have a claim adjudicated by an Article III court and, as such, the right is subject to waiver. *Id.* at 848. As the Supreme Court's decision in *Schor* illustrates, the defendants have waived any personal right they had to have their counterclaims heard by an Article III court.

In *Schor*, William Schor filed suit against ContiCommodity Services, Inc. (Conti) with the Commodity Futures Trading Commission (CFTC) under the Commodities Exchange Act (CEA)

---

[4]     The Court also rejected the debtor's arguments that the bankruptcy court could enter final judgment because it was a mere adjunct of the district court, *id.* at 2618, and because a failure to recognize the bankruptcy court's authority would result in "significant delays and impose additional costs on the bankruptcy process," *id.* at 2619.

seeking reparations for alleged violations of the Act. *Id.* at
836-37.  Prior to receiving notice of Schor's CEA action,
however, Conti had filed suit in federal court to recover a debit
owed on Schor's account. *Id.* at 837.  Schor counterclaimed in
the district court action and then moved to dismiss or stay the
action pending resolution of the CEA action he filed with the
CFTC, contending that "the continuation of the federal action
would be a waste of judicial resources and an undue burden on the
litigants in view of the facts that 'the reparations proceedings
. . . will fully . . . resolve and adjudicate all the rights of
the parties to this action with respect to the transactions which
are the subject of this action.'" *Id.* at 838 (quoting Joint App.
8).  The district court declined to dismiss or stay, but Conti
nevertheless voluntarily dismissed the action and asserted its
counterclaim in the CFTC reparations proceeding. *Id.*  The
Administrative Law Judge (ALJ) in the CFTC action found against
Schor on his reparations claim and in favor of Conti on its
counterclaim. *Id.*  Only after this ruling did Schor challenge
the CFTC's authority to adjudicate the counterclaim. *Id.*

Finding against Schor, the Supreme Court determined that he
had "indisputably waived" any right to an Article III
adjudication of the counterclaim by expressly demanding that
Conti proceed with its counterclaim before the CFTC and not in
the district court and by failing to raise the issue until after

14

the ALJ had ruled against him.   *Id.* at 849.   Further, even beyond

this finding of express waiver, the Court also found that Schor

had implicitly waived his right to an adjudication of the

counterclaim by an Article III judge by seeking relief from the

CFTC in the first instance:

> Even were there no evidence of an express waiver
> here, Schor's election to forgo his right to proceed in
> state or federal court on his claim and his decision to
> seek relief instead in a CFTC reparations proceeding
> constituted an effective waiver.   Three years before
> Schor instituted his reparations action, a private right
> of action under the CEA was explicitly recognized in the
> Circuit in which Schor and Conti filed suit in District
> Court.   Moreover, at the time Schor decided to seek
> relief before the CFTC rather than in the federal courts,
> the CFTC's regulations made clear that it was empowered
> to adjudicate all counterclaims "arising out of the same
> transaction or occurrence or series of transactions or
> occurrences set forth in the complaint."   Thus, Schor had
> the option of having the common law counterclaim against
> him adjudicated in a federal Article III court, but, with
> full knowledge that the CFTC would exercise jurisdiction
> over that claim, chose to avail himself of the quicker
> and less expensive procedure Congress had provided him.
> In such circumstances, it is clear that Schor effectively
> agreed to an adjudication by the CFTC of the entire
> controversy by seeking relief in this alternative forum.

*Id.* at 849-50.[5]   The facts in *Schor* are nearly on all fours with

this case.

With respect to the debtor, it has "indisputably waived" its

---

[5]   Such implied consent to adjudication by a non-Article III
judge has been upheld in other contexts similar to proceedings
referred to bankruptcy judges.   *See Roell v. Withrow*, 538 U.S.
580, 583 (2003) ("Inferring consent in these circumstances thus
checks the risk of gamesmanship by depriving parties of the
luxury of waiting for the outcome before denying the magistrate
judge's authority.").

personal right to have its counterclaims determined by an Article III court.  Adams Bank commenced this case in the D.C. Superior Court, and the defendants asserted their counterclaims in that action.  After the defendants lost their motion for temporary restraining order, the debtor filed its bankruptcy case and thereafter removed the Superior Court action to this court.  Like *Schor*, it was debtor's choice to litigate in this court and it was only after the court entered judgment in favor of Adams Bank on the loan that it raised a challenge to this court's authority. Indeed, in its notice of removal the debtor averred that "the subject proceeding is a 'core proceeding' pursuant to the provisions of 28 U.S.C. § 157(b)(2)(O), Not. Remov. ¶ 3.  Neither the debtor nor the debtor's co-defendants ever challenged the debtor's characterization of the proceeding as a core proceeding (as to which 28 U.S.C. § 157(b)(1) authorizes the bankruptcy court to enter a final judgment subject to review only by way of appeal under 28 U.S.C. § 158); nor did they ever voice an objection, prior to the entry of the final judgment, that Article III of the Constitution barred the court from entering a final

judgment.[6]

Additionally, at hearings of January 10, 2011, and January

28, 2011, the proceeding was treated as a core proceeding.[7]  At

neither of those hearings did the defendants object to the

court's treating the proceeding as a core proceeding.  Similarly,

after the court granted Adams Bank's motion for partial summary

judgment as to the defendants' counterclaims, Adams Bank filed a

motion for summary judgment as to its claim on the loan.  I

initially granted that second motion as unopposed on April 29,

2011.  The defendants thereafter filed a motion to reconsider

averring that they had an agreement with the plaintiff to extend

the time to file their response.  Nowhere in this  motion to

---

[6]  As guarantors, the debtor's co-defendants have contingent
claims against the estate (see 11 U.S.C. § 509(a)) and it is
arguable that determining the amount of their guarantee
obligations is a step in determining their contingent claims
against the estate, and thus a core proceeding, and that the
bankruptcy court's making that determination would be
constitutional as part of the claims allowance process.
Nevertheless, I will assume, without deciding, that the
proceeding was non-core, and only a "related to" proceeding as to
the debtor's co-defendants.

[7]  At the January 10, 2011 hearing, the court noted that the
debtor's notice of removal had treated the proceeding as a core
proceeding, and asked Adams Bank as the plaintiff if it consented
to treating the proceeding as a core proceeding, which it did.
None of the defendants objected to the court's treating the
proceeding as a core proceeding.  At the hearing of January 28,
2011, the court noted that the proceeding was a core proceeding
"because it deals with the bank's claim against the debtor."
None of the defendants objected that the proceeding was only a
non-core "related to" proceeding as to the debtor's
co-defendants.

reconsider, however, did the defendants contend that the court
lacked authority to enter a final decision on Adams Bank's
summary judgment motion; rather, it was not until after the court
entered final judgment that the defendants raised the issue of
authority.  To paraphrase *Stern*, "If the [debtor] believed that
the Bankruptcy Court lacked the authority to decide [its] claim .
. . , then [it] should have said so--and said so promptly."
*Stern*, 131 S. Ct. at 2608.  Its failure to do so constitutes a
waiver of its individual right to an Article III adjudication.

The same holds true for the co-defendants.  Although the co-
defendants did not directly remove the Superior Court proceeding
to this court,[8] they too failed to challenge this court's
authority to adjudicate their counterclaims throughout the
proceeding.  "In such cases, as here, the consequences of a
litigant sandbagging the court--remaining silent about his
objection and belatedly raising the error only if the case does
not conclude in his favor--can be particularly severe."  *Id*.
That severe result is a waiver of the personal right to an

---

[8]   Gloria B. Herndon, one of the co-defendants, is the
President and CEO of the debtor and the manager of Twelfth Street
Partners, the debtor's other co-defendant.

Article III adjudication.[9]

C

A separation of powers structural interest is also protected by Article III. *Stern*, 131 S. Ct. at 2608, citing *Northern Pipeline*, 458 U.S. at 58 (plurality opinion). Nevertheless, the Court had no occasion in *Stern* to decide whether, if Pierce had waived his personal interest in an Article III court adjudicating the counterclaim, the Article III structural interest would have precluded a bankruptcy court, as a non-Article III court, from adjudicating the counterclaim. Indeed, if the structural interest alone sufficed, there would have been no occasion to address the question of whether Pierce had consented to the bankruptcy court's adjudicating the counterclaim against him. The decision in *Stern* emphasized that "[t]he structural principles secured by the separation of powers protect the individual as well," 131 S. Ct. at 2601 (quoting *Bond v. United States*, 131 S. Ct. 2355, 2365 (2011)), and its focus on structural principles might be viewed as a reaction to the

---

[9]     The defendants might contend that there was no sandbagging here because *Stern* represented a wholesale change in the law. This, however, is not the case. The debtor's attorney is an experienced bankruptcy attorney who appears often before this court, and the decision in *Stern* affirmed a March 2010 decision by the Ninth Circuit holding that bankruptcy court lacked core authority over state law counterclaims such as Vicki Marshall's. *In re Marshall*, 600 F.3d 1037 (9th Cir. 2010). If the defendants thought they were entitled to have their counterclaims adjudicated by an Article III tribunal, there was certainly precedent to support their position.

dissent's suggestion that the formal limitations of Article III
can be overcome by a balancing test that would confer
adjudicative power on a bankruptcy judge when there is not even
truly consent by all of the parties.

Nevertheless, the Court's lengthy discussion in part III(A)
of its *Stern* decision of structural principles underlying Article
III raises a concern that the Court might think that even
bankruptcy judge adjudications with the consent of the parties
would run afoul of Article III.[10]   In contrast to the personal
right to an Article III adjudication, when the structural
separation of powers principles embodied in Article III would be
offended by adjudication of a dispute by a non-Article III
tribunal, the limitations those principles embody cannot be
waived by the parties.   *Schor*, 478 U.S. at 850-51.   "When these
Article III limitations are at issue, notions of consent and
waiver cannot be dispositive because the limitations serve
institutional interests that the parties cannot be expected to
protect."   *Id.* at 851.   Namely, in addition to the individual

---

[10]   For example, the Court observed that it has repeatedly
recognized that "Congress may not 'withdraw from judicial
cognizance any matter which, from its nature, is the subject of a
suit at the common law, or in equity, or admiralty.'" *Stern*, 131
S. Ct. at 2609 (quoting *Murray's Lessee v. Hoboken Land &
Improvements Co.*, 59 U.S. 272, 18 How. 272, 284 (1856)).   Rather,
when a suit is traditionally one at common law and is brought
into the bounds of federal jurisdiction, "the responsibility for
deciding that suit rests with Article III judges in Article III
courts."   *Id.*

right to a fair and impartial tribunal, Article III, § 1,
"safeguards the role of the Judicial Branch in our tripartite
system by barring congressional attempts to transfer jurisdiction
[to non-Article III tribunals] **for the purpose of emasculating
constitutional courts**." *Id.* at 850 (citations and internal
quotations omitted) (alterations in original) (emphasis added).

The Court's failure in *Stern* to address this non-waivable
character of the structural protections of Article III suggests,
however, that it was not thinking that bankruptcy judges'
adjudications, made with the consent of the parties, would run
afoul of Article III under the structure of the current
bankruptcy system.  The Court has upheld Article III courts'
discretionary referrals, pursuant to the consent of the parties,
of civil matters for adjudication by non-Article III entities.
*Heckers v. Fowler*, 69 U.S. (2 Wall.) 123 (1865).  Indeed, that
practice has a historical pedigree such that it would pass
constitutional muster under Justice Scalia's view in his
concurring opinion in *Stern*, 131 S. Ct. at 2621, that "an Article
III judge is required in all federal adjudications, unless there
is a firmly established historical practice to the contrary."
*See Heckers v. Fowler*, 69 U.S. at 131 ("Practice of referring
pending actions under a rule of court, by consent of parties, was
well known at common law . . . .").

The Court has upheld exercise of the Article III judicial

power by a magistrate judge, a non-Article III judge, with the
consent of the parties.  *See Peretz v. United States*, 501 U.S.
923, 936 (1991) ("Even assuming that a litigant may not waive
structural protections provided by Article III, see *Schor*, 478
U.S., at 850-851, we are convinced that no such structural
protections are implicated by the procedure followed in this
case" (addressing referral of jury voir dire to magistrate judge
in a criminal case)).  Magistrate judges operate under a
statutory scheme which allows them to decide referred civil
actions by consent, a statutory scheme that is roughly similar to
the current bankruptcy system allowing bankruptcy judges to
decide referred proceedings by consent of the parties.  Courts of
appeal, including the court of appeals for this circuit, that
have addressed the issue have uniformly held that Article III is
not violated when a magistrate judge, operating pursuant to the
consent of the parties and referral from the district court,
enters a final judgment in a civil action.  *See Fields v.
Washington Metro. Area Transit Auth.*, 743 F.2d 890, 893 (D.C.
Cir. 1984); *In re Olde Prairie Block Owner, LLC*, 2011 WL 3792406
(Bankr. N.D. Ill. Aug. 25, 2011) (collecting court of appeals
decisions and viewing them dispositive of bankruptcy courts'
authority to issue final judgments by consent of the parties).
The courts of appeals base such rulings in part on *Heckers v.
Fowler* and the Article III judiciary's powers of control over

22

magistrate judges (including the powers of appointment, re-appointment, and removal, and the discretion to refer or not refer).

Similarly, under the current bankruptcy system, a bankruptcy judge's hearing and determining a matter by the consent of the parties does not offend Article III.  Under the current bankruptcy system, bankruptcy judges are appointed (and re-appointed) by the court of appeals under 28 U.S.C. §§ 152(a)(1) for a fourteen-year term and may be removed from office only by the circuit judicial council "for incompetence, misconduct, neglect of duty, or physical or mental disability" under 28 U.S.C. § 152(e).  Moreover, the district court decides whether to provide that bankruptcy cases and proceedings shall be referred to the bankruptcy judges for the district, 28 U.S.C. § 157(a), and any proceeding referred to the bankruptcy judges may be withdrawn by the district court.  28 U.S.C. § 157(d).  When a proceeding is decided by a bankruptcy judge pursuant to the consent of the parties, the ruling still remains subject to review on appeal by an Article III tribunal.  28 U.S.C. § 158. The statutory scheme is not one designed to emasculate the Article III judiciary, and thus does not raise an Article III structural concern.  *See Northern Pipeline*, 458 U.S. at 79 n.30 (plurality opinion) (stating, as regards magistrates hearing civil actions by consent, that there is "no serious threat that

the exercise of the judicial power would be subject to incursion by other branches"). The current bankruptcy system is not a Congressional attempt to emasculate the Article III judiciary.

*Stern* viewed *Northern Pipeline* as controlling the outcome in *Stern*. The holding of *Northern Pipeline*, the Court observed in *Thomas v. Union Carbide Agr. Products Co.*, 473 U.S. 568, 584 (1985), "establishes only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review. 458 U.S., at 84, 102 S. Ct., at 2878 (plurality opinion); *id.* at 90-92, 102 S. Ct., at 2881-2882 (opinion concurring in judgment); *id.* at 92, 102 S. Ct., at 2882 (Burger, C.J., dissenting)." The holding of the Court's decision in *Stern* is similarly limited: the Court held that Pierce had not consented to the counterclaim against him being decided by a non-Article III court, and that he was entitled to have the counterclaim decided by an Article III court. Indeed, the Court observed in *Stern* that the quoted passage from *Thomas* directly covered the *Stern* case once you substitute the word "tort" for "contract" in the passage. *Stern*, 131 S. Ct. at 2615. Accordingly, Pierce's personal interest in having an adjudication by an Article III court sufficed to dispose of the matter. Moreover, the Court in *Stern* gave broad

24

hints that the structural interest would not prohibit

adjudication of such a counterclaim when there *is* consent.

First, as noted already, it quoted and embraced the just

quoted passage from *Thomas* without qualification, a passage in

which the Court had emphasized that the *Northern Pipeline* holding

only addressed bankruptcy court adjudication of a bankruptcy

trustee's contract action when there has *not* been consent.  As

noted in Ralph Brubaker, *Article III's Bleak House (Part II): The

Statutory Limits of Bankruptcy Judges' Core Jurisdiction*, 31

Bankr. L. Letter No. 9, at  (Sept. 2011) (hereafter "Brubaker"):

> Justice Brennan's plurality [*Northern Pipeline*] opinion,
> in describing the limits on 1898 Act summary referee
> jurisdiction that the 1978 Reform Act exceeded, twice
> noted that with consent referees could hear and finally
> determine plenary suits, citing *MacDonald v. Plymouth
> County Trust Co.*, [286 U.S. 263 (1932)]. [*Northern
> Pipeline*, 458 U.S. at 53, 80 n.31.] Justice Rehnquist's
> concurrence repeatedly  [(*id.* at 89, 91)] emphasized
> defendant Marathon's objection to the bankruptcy court
> deciding the action at issue as a determinative feature
> in the unconstitutionality of the bankruptcy court's
> judgment.  Moreover, the dissents of both Chief Justice
> Burger (describing the holding of the Court) [*id.* at 92]
> and Justice White [*id.* at 95] also expressly stated their
> understanding that consent of the litigants to final
> adjudication in a non-Article III bankruptcy court would
> cure any unconstitutionality under the Court's holding,
> "just as [was the case] before the 1978 Act was adopted."
> [*Id.* at 95 (White, J., dissenting).]

In this regard, the Court in *Stern* thought that its decision

"does not change all that much . . . ."  131 S. Ct. at 2620.  A

ruling that § 157(c)(2), permitting the bankruptcy judge, with

the consent of the parties, to decide non-core proceedings, is

unconstitutional, however, would be a huge change.

Second, it cited 28 U.S.C. § 157(c)(2) (allowing the
bankruptcy court, with the parties' consent, to enter final
judgments in non-core proceedings that would otherwise require
proposed findings of fact and conclusions of law subject to *de
novo* review by the district court) without suggesting it was
constitutionally infirm.[11]

Third, it noted that after *Northern Pipeline*, Congress
provided in a 1984 act that bankruptcy judges were to be
appointed by the courts of appeals for the circuits in which
their districts are located. *Stern*, 131 S. Ct. at 2610. In
addition, it noted that "the current bankruptcy system . . .
permits the district court to withdraw from the bankruptcy court
any referred case, proceeding, or part thereof, § 157(d)."
*Stern*, 131 S. Ct. at 2620. These are both features of the

---

[11] In concluding that Pierce had waived any right to insist
that *his* claim against the estate be tried in the district court
under 28 U.S.C. § 157(b)(5) as a personal injury tort claim, the
Court observed:

> Section 157 allocates the authority to enter final
> judgment between the bankruptcy court and the district
> court. See §§ 157(b)(1), (c)(1). That allocation does
> not implicate questions of subject matter jurisdiction.
> See § 157(c)(2) (parties may consent to entry of final
> judgment by bankruptcy judge in non-core case). By the
> same token, § 157(b)(5) simply specifies where a
> particular category of cases should be tried. Pierce does
> not explain why that statutory limitation may not be
> similarly waived.

131 S. Ct. at 2607.

current bankruptcy system that Congress enacted in 1984 in
response to *Northern Pipeline* and in an attempt to assure that
the bankruptcy system would pass constitutional muster.  These
provisions go to the structural interest that Article III
protects, not the individual interest it protects.

Fourth, the Court contrasted Pierce, who had not truly
consented to have the counterclaim against him decided by the
bankruptcy court, to the objecting party in *Schor*.  In *Schor*, the
Court explained that:

> [O]ur prior discussions of Article III, § 1's guarantee
> of an independent and impartial adjudication by the
> federal judiciary of matters within the judicial power of
> the United States intimated that this guarantee serves to
> protect primarily personal, rather than structural
> interests.  See, *e.g.*, [*Northern Pipeline*, 458 U.S.] at
> 90 (Rehnquist, J., concurring in judgment) (noting lack
> of consent to non-Article III adjudication); *id.*, at 95
> (White, J., dissenting) (same).  See also Currie,
> Bankruptcy Judges and the Independent Judiciary, 16
> Creighton L.Rev. 441, 460, n. 108 (1983) (Article III,
> § 1, "was designed as a protection for the parties from
> the risk of legislative or executive pressure on judicial
> decision").  Cf. *Crowell v. Benson*, [285 U.S. 22 (1932)]
> at 87 (Brandeis, J., dissenting).
>
>         ....[A]s a personal right, Article III's guarantee
> of an impartial and independent federal adjudication is
> subject to waiver, just as are other personal
> constitutional rights that dictate the procedures by
> which civil and criminal matters must be tried.
> [Citations omitted.]  Indeed, the relevance of concepts
> of waiver to Article III challenges is demonstrated by
> our decision in *Northern Pipeline*, in which the absence
> of consent to an initial adjudication before a
> non-Article III tribunal was relied on as a significant
> factor in determining that Article III forbade such
> adjudication. See, *e.g.*, 458 U.S. at 80 n.31; *id.*, at 91
> (Rehnquist, J., concurring in judgment); *id.*, at 95
> (White, J., dissenting).

27

*Schor*, 478 U.S. at 848-49.

Fifth, as noted by Brubaker, at 4-7, *Stern* adopted an analytical framework under which the Court's decisions regarding the permissible extent to which referees under the Bankruptcy Act of 1898 could treat matters as summary proceedings in which they could issue final judgments control when bankruptcy judges under the current bankruptcy system may enter similar judgments without running afoul of Article III.  Congress had often left it to the Court under the 1898 Act to decide what proceedings fell within the category of a summary proceeding.  Brubaker, at 7.  Of pertinence to the issues of the effect of consent, the Court held in *MacDonald* that "[t]he referee may, if the parties consent, try the issues which must otherwise be tried in a plenary suit brought by the trustee," and in such a suit, "[w]e can perceive no reason why the privilege of claiming the benefits of the procedure in a plenary suit . . . may not be waived by consent, as any other procedural privilege of the suitor may be waived, and a more summary procedure substituted." *MacDonald*, 286 U.S. at 267.  As noted by Brubaker, at 24, although *MacDonald* was a decision interpreting a statute, and did not address Article III, it is doubtful that the Court would have adopted the statutory construction it adopted if there were an Article III structural problem with referees deciding with consent of the litigants a matter that would otherwise be tried by an Article III court as a

28

plenary matter.

For all of these reasons, I conclude that even after *Stern v. Marshall*, the bankruptcy court may adjudicate a proceeding, without running afoul of Article III, when there has been consent by the parties. Other bankruptcy courts have reached the same conclusion. *See, e.g., In re Olde Prairie Block Owner, LLC, 2011 WL 3792406*, at *7-8 (Bankr. N.D. Ill. Aug. 25, 2011); *Pro-Pac, Inc. v. Chapes (In re Pro-Pac, Inc.)*, 2011 WL 4469973, at *2 (Bankr. E.D. Wis. Sept. 27, 2011); *Robinson v. Questex Media Group, LLC (In re Oxford Expo., LLC)*, 2011 WL 4074028, at *6-9 (Bankr. N.D. Miss. Sept. 13, 2011); *In re Safety Harbor Resort and Spa*, 2011 WL 3849639, *11-12 (Bankr. M.D. Fla. Aug. 30, 2011).

D

Even if consent were not determinative, the court had authority to decide this dispute as to the debtor. As outlined above, there are a few limited exceptions to the principle that a federal tribunal must be an Article III tribunal in order constitutionally to enter a final judgment in a proceeding.

Under the "public rights" exception, an Article I court may hear cases where "Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, [has] create[d] a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter

29

appropriate for agency resolution with limited involvement by the Article III judiciary." *Thomas v. Union Carbide Ag. Prods. Co.*, 473 U.S. 568, 586 (1985).  As the Court has previously held, however, state law counterclaims asserted in a bankruptcy case do not fall within this exception. *Stern*, 131 S. Ct. at 2611; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989); *Northern Pipeline*, 458 U.S. at 71.

Within bankruptcy, the Supreme Court has recognized a second exception to Article III's requirement that common law claims be heard by an Article III tribunal: when the "action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 131 S. Ct. at 2618.  In *Katchen v. Landy*, 382 U.S. 323 (1966), the Supreme Court upheld a bankruptcy referee's exercise of summary adjudication authority over a preference action against a creditor that filed a proof of claim in the bankruptcy case. *Id.* at 327-28.  Under the Bankruptcy Act, as today, preferential payments were a basis for denying a creditor's claim in bankruptcy. *Id.* at 330.  Because "the same issue [arose] as part of the process of allowance and disallowance of claims," *Id.* at 336, the summary adjudication of the action by the bankruptcy referee did not run afoul of Article III. *Stern*, 131 S. Ct. at 2616-17.  The Court's decision in *Langenkamp v. Kulp*, 498 U.S. 42 (1990), is in accord. *Id.*  The issue, then, is whether a ruling on Adams Bank's claim would

"necessarily result in the resolution of [the defendants']
counterclaim[s]."  *Id.* at 2618.  The issue must be addressed
first as to the debtor and then as to the debtor's co-defendants.

The court unquestionably had authority to determine Adams
Bank's claim against the estate, and the court unquestionably had
authority to enter a judgment reflecting that determination.
Determination of that claim will necessarily result in resolution
of the debtor's counterclaims for reasons set forth below.

Adams Bank's complaint to recover on its loan to the debtor
was a simple pleading and can be summed up as follows: (1) the
debtor borrowed money from Adams Bank; (2) the co-defendants
guaranteed the loan; (3) the defendants entered into a series of
modifications and ultimately a forbearance agreement; (4) in the
forbearance agreement the defendants acknowledged they owed
principal, interest, late fees, and costs on the loan; and (5)
the defendants breached the terms of the forbearance agreement.
If deciding these issues would "necessarily result in the
resolution of [the defendants'] counterclaim[s]," then, under
*Stern*, ajdudicative authority lay in the bankruptcy court.  I
turn now to the defendants' counterclaims.

The Defendants' Amended Responsive Pleading, Answer,
Counterclaim, and Demand for Jury Trial asserted six counterclaim

counts.[12]

Count I was for breach of contract.  In that count the defendants alleged that Adams Bank breached the Building Loan Agreement "by failing to deliver payment of the loan proceeds in a full and timely manner to GBHAI," Amd. Ans. ¶ 15, and, as a result, the debtor suffered damages through the loss of sale contracts on the property, and additional costs and expenses, Amd. Ans. ¶ 20.

Count II was for tortious interference with contract.  In that count the defendants alleged that Adams Bank tortiously interfered with its sales contracts with third parties by failing to timely release funds under the Building Loan Agreement, Amd. Ans. ¶ 24, and as a result the defendants lost the sales contracts, Amd. Ans. ¶ 25.

Count III was for breach of duty of good faith and fair dealing.  In that count the defendants alleged that Adams Bank

---

[12]     The defendants initial amended answer only asserted the first three counts as counterclaims.  Prior to ruling on Adams Bank's motion for partial summary judgment as to these three counts, the defendants filed a motion for leave to file a second amended answer that asserted three additional counts.  At the January 28, 2011, hearing on Adams Bank's motion for partial summary judgment as to the counterclaims, I denied the defendants' motion for leave to amend and found that even if leave were granted, summary judgment would be appropriate as to the additional counts.  Because I made a ruling as to those three additional counts and because another court might have granted the defendants leave to amend, for purposes of this decision I will treat those counts as though they had been properly asserted and determine whether authority lay as well to adjudicate those counts.

breached its implied duty of good faith and fair dealing by
failing to deliver the loan proceeds as provided in the Building
Loan Agreement, Amd. Ans. ¶ 28, and as a result the defendants
lost sales contracts on the condominium and townhouse units, Amd.
Ans. ¶ 30.  This count further alleged that Adams Bank breached
its duty by demanding payments from the defendants, "despite the
knowledge that Adams Bank itself had failed to timely deliver the
loan proceeds required to be disbursed under the Building Loan."
Amd. Ans. ¶ 31.

Count IV was for misrepresentation.  In that count the
defendants alleged that Adams Bank had misrepresented that it
would "honor the terms of the Loan Agreement," 2nd Amd. Ans. ¶
38, that Adams Bank had breached the Building Loan Agreement and
subsequent modification, 2nd Amd. Ans. ¶ 39, and that Adams Bank
had represented that it "was a solvent lender capable of honoring
its loan commitments, when it was no[t] capable of doing so," 2nd
Amd. Ans. ¶ 40.

Count V was for fraud.  In that count the defendants alleged
that Adams Bank had "present[ed] itself as interested in being
mutually bound by a contract with Counter-Plaintiffs," 2nd Amd.
Ans. ¶ 42, when in fact there was no such intent, 2nd Amd. Ans. ¶
43.  In support of this contention the defendants cited to
several failures by Adams Bank to advance funds, the latest being
April 2009.

33

Count VI was for undue influence.  In that count the
defendants alleged that after they signed the Building Loan
Agreement that they were "economically dependent upon Adams
Bank's performance of the contract to avoid going bankrupt," 2nd
Amd. Ans. ¶ 50, and because of this economic dependence and Adams
Bank's size, the defendants were "forced to either accept an
unfavorable Loan Modification waving more and more of their
rights or be forced into bankruptcy," 2nd Amd. Ans. ¶ 52.  But
for this undue influence, the defendants alleged they would not
have entered into either the loan modification or the forbearance
agreement.

Any decision on Adams Bank's complaint would necessarily
dispose of each of these counts.  The forbearance agreement
provided that the defendants irrevocably waived any "claim,
action, cause of action, defense, counterclaim, or set-off of any
kind or nature which they now may assert against lender in
connection with the making, closing, administration, collection
or enforcement by lender of any of the obligations of debtors to
lender . . . ."  Forbearance Agrmt. ¶ 29.  In ruling on Adams
Bank's complaint, I would necessarily have to determine that the
forbearance agreement was enforceable, and in ruling on any
defenses the debtor had to the complaint, I would necessarily
have to decide whether the waiver clause in particular was
enforceable.  Making this determination would necessarily dispose

34

of any counterclaims that existed prior to the execution of the forbearance agreement.  Thus, to the extent the counterclaims were based on acts that occurred prior to the execution of the forbearance agreement, this court had authority to hear and decide the claims.

To the extent the counts asserted as counterclaims were based on acts or omissions after the forbearance agreement, a finding that the forbearance agreement was enforceable would necessarily dispose of those as well.  Counts I, II, III, and V all allege as integral parts of the claims Adams Bank's failure to advance funds as provided in the Building Loan Agreement. Paragraph 2.3 of the forbearance agreement provided that "Lender shall not be obligated to advance any further funds to complete the Project."  In finding the forbearance agreement enforceable, I would necessarily determine that Adams Bank had no further obligation to advance funds.  Thus, to the extent the counts were based on a failure to advance funds after the forbearance agreement,[13] the court likewise had authority to decide the debtor's counterclaims.  Counts IV and VI both alleged facts that speak to the enforceability of the forbearance agreement in the first instance.  Finding the agreement enforceable would necessarily resolve these counts and, thus, I had authority to

---

[13]   Any counterclaims for a failure to advance prior to this period were waived, as previously discussed.

35

decide these portions of the debtor's counterclaims as well.

Because a ruling on Adams Bank's complaint would necessarily dispose each count asserted as a counterclaim, I find that this court had authority to hear and enter final judgment on the debtor's counterclaims.  Thus, the defendants' Motion for Relief from Judgment and to Alter or Amend Judgment is appropriately denied as to the debtor.

E

Neither the debtor's co-defendants' claims against Adams Bank nor the bank's claims against them were claims against the estate, but they were nevertheless resolved in the claims allowance process regarding Adams Bank's claim against the estate.  This is because the debtor's co-defendants would be bound by the decision against the debtor even if there had not been a waiver of their right to an Article III court adjudication.  The debtor's co-defendants raised no claims other than those raised by the debtor.  Nor did they defend against Adams Bank's claims against them on grounds other than those embodied in the debtor's counterclaims that (as discussed above) the court unquestionably had authority to decide.  (For example, they did not contest that they are guarantors of the debtor's debt.)  Being in privity with the debtor, they are necessarily bound by the ruling against the debtor as a matter of issue preclusion (collateral estoppel).  Moreover, the court's ruling

is based on a question of law (whether summary judgment was
appropriate), and that ruling would be subject to de novo review
by the District Court on appeal, such that the District Court's
authority to adjudicate any questions of law would not be
infringed.  Finally, the defendants have only sought
reconsideration regarding the court's authority to dispose of the
defendants' counterclaims.  They have not contended that if the
court had authority to decide the counterclaims, the court
nevertheless lacked authority to decide Adams Bank's claims
against them.

However, whether those considerations serve as a basis for
finding authority in the bankruptcy court to adjudicate the
claims by or against the co-defendants is an academic point.  As
in the case of Pierce Marshall's waiver of his right to have his
claim against the estate in *Stern v. Marshall* heard by the
district court based on the claim being a personal injury tort
claim to which 28 U.S.C. § 157(c)(5) applied, the debtor's co-
defendants waived any objection to the bankruptcy court's
adjudication of the claims by or against them.  They waived any
objection to the bankruptcy court's entering final judgment
subject to that judgment being set aside based on a de novo
review by the district court of the questions of law presented by
Adams Bank's successful motion for summary judgment.  In *Stern v.
Marshall*, in contrast, the Court emphasized that Pierce Marshall

37

had consistently objected to the bankruptcy court entering final judgment against him. *Stern,* 131 S. Ct. at 2601.

IV

Although, for the reasons previously stated, I believe this court had authority to hear and enter a final judgment disposing of the defendants' counterclaims, and entering a judgment in favor of Adams Bank as to its claims, in the event the district court on appeal finds otherwise, the following are my proposed findings of facts and conclusions of law as to Adams Bank's motion for partial summary judgment as to the defendants' counterclaims (and thus as to entering judgment in favor of Adams Bank's claims):

• There is no dispute of material fact that the December 22, 2009, forbearance agreement is a valid, enforceable agreement.

• There is no dispute of material fact that the pre-existing claim waiver provision, paragraph 29, of the December 22, 2009, forbearance agreement is a valid, enforceable provision and under the terms of that provision the defendants waived all pre-existing claims against Adams Bank.

• Under the terms of the December 22, 2009, forbearance agreement, Adams Bank was under no obligation to advance further funds to the debtor.

38

- Because it is undisputed that both the December 22, 2009, forbearance agreement is enforceable and the pre-existing claim waiver provision therein are enforceable, any counterclaim stemming from acts or omissions that occurred prior to the execution of the forbearance agreement are barred.

- Because it is undisputed that the December 22, 2009, forbearance agreement is valid and enforceable and because Adams Bank had no obligation to further advance funds to the debtor under that agreement, any claims based on Adams Bank's failure to advance funds on counterclaims that had not been waived fail.

V

For the foregoing reasons, I will deny the defendants' Motion for Relief from Judgment and to Alter or Amend Judgment. A separate order follows.

[Signed and dated above.]

Copies to: All counsel of record.